UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 24-cr-20098-BLOOM/Elfenbein**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL ANTHONY ABBOTT,

      Defendant.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendant Michael Anthony Abbott's Motion for Judgment of Acquittal, ECF No. [147], and Motion for New Trial, ECF No. [148], filed on July 17, 2025. The Government filed a consolidated Response to both Motions, ECF No. [149], to which Defendant filed a consolidated Reply. ECF No. [152]. The Court has considered both Motions, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons that follow, the Motions are denied.

## I.     BACKGROUND

On July 2, 2025, after a three-day trial, the jury found Defendant Michael Anthony Abbott guilty as to Count I of the Superseding Indictment: "knowing[] transmi[ssion] in interstate commerce any communication containing a threat to injure the person of another . . . with the intent to communicate a threat and with the knowledge that it would be viewed as a threat," in violation of 18 U.S.C. § 875(c). ECF No. [134]. The Superseding Indictment identified one email that Defendant allegedly sent on December 18, 2022: "I will shoot onsite: [E.P., A.P.P., A.S., and D.G.]" ECF No. [84] at 1. The individuals identified in the email were "law enforcement officers from the City of Coral Gables Police Department[.]" *Id.*

Defendant timely filed a Motion for Judgment of Acquittal ("Motion for Acquittal"), in which he argues (1) the evidence presented at trial was insufficient to sustain a conviction under Section 875(c); and (2) even if sufficient, the conviction runs afoul of the First Amendment. ECF No. [147]. Defendant also filed a Motion for New Trial in which he argues (1) the jury instructions invited confusion and did not clearly track the elements of the offense; (2) the offense instruction was legally incorrect, applied an incorrect standard, and permitted arguments and evidence on intent and knowledge that constructively amended the Superseding Indictment; (3) the Government's repeated emphasis on language in other parts of the December 18, 2022 email resulted in a constructive amendment; (4) the Government injected 404(b) propensity arguments; and (5) the Court erred by limiting Defendant's cross-examination of Officer Steele.

In Response to the Motion for Acquittal, the Government argues: (1) Defendant knew and intended his death threats to be understood as threats; (2) Defendant's email was a true threat; and (3) Defendant's conviction under Section 875(c) does not violate his First Amendment rights. ECF No. [149] at 1-13. In Response to the Motion for New Trial, the Government argues (1) there is no "critical distinction" between knowledge that a statement would be viewed as threatening and intent to communicate a threat; (2) the Government may charge in the conjunctive and prove in the disjunctive; (3) the Government did not constructively amend or vary from the indictment and, even so, there is no possible prejudice because Defendant received a limiting instruction; (4) Defendant does not state what specific unnoticed 404(b) evidence was introduced at trial and, therefore, the Government cannot respond to its argument that such evidence was improperly introduced; and (5) to the extent Defendant wanted to impeach Officer Steele, his credibility was not an issue in this case, and, his beliefs about whether he was above the law would not provide a defense to the charged conduct. *Id.* at 13-21.

In Reply, regarding the Motion for Acquittal, Defendant argues (1) the evidence at trial was legally insufficient because the Government failed to establish Defendant's subjective intent and that the communication constituted a true threat; and (2) the conviction violates the First Amendment. ECF No. [152] at 1-9. Regarding the Motion for New Trial, Defendant argues a new trial is warranted because of instructional error, constructive amendment, variance, and evidentiary rulings that prevented a fair trial. *Id.* at 9-12.

## II.   LEGAL STANDARD

### A.  Rule 29(c)—Motion for Judgment of Acquittal

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). As Defendant has done here, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

When deciding a motion under Rule 29, the district court must determine "whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004) (quoting *United States v. Greer,* 850 F.2d 1447, 1450 (11th Cir. 1988)). Therefore, the test is whether a reasonable jury could find, beyond a reasonable doubt, that the defendant is guilty of violating the crimes alleged in the indictment. *United States v. Macko*, 994 F.2d 1526, 1532 (11th Cir. 1993). Applying this test, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 611 F.2d at 1323 (citing *United States v. Gianni*, 678 F.2d 956, 958-59 (11th Cir. 1982) and *United States v.*

*Burns*, 597 F.2d 939, 941 (5th Cir. 1979)). Because a jury may choose among reasonable constructions of the evidence, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 1323-24 (quoting *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990)). "A conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (citing *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005)).

### B. Rule 33—Motion for New Trial

A motion for a new trial is "addressed to the sound discretion of the trial court." *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987). When a motion for new trial is based on claims that the verdict is contrary to the weight of the evidence, "the court need not view the evidence in the light most favorable to the verdict" but "may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (citing *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980) and *United States v. Simms*, 508 F. Supp. 1188, 1202 (W.D. La. 1980)). "If the court concludes that, 'despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.'" *Id.* (quoting *Lincoln*, 630 F.2d at 1319). However, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 1312-13 (citing *Simms*, 508 F. Supp. at 1202). In order for the court to set aside the verdict, the court must decide that the evidence "preponderate[s] heavily against the verdict, such that it

4

would be a miscarriage of justice to let the verdict stand." *Id.* at 1313 (citing *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir. 1979)). Because motions for new trial based on the weight of the evidence are disfavored, they are granted "sparingly and with caution, doing so only in those really 'exceptional cases.'" *Id.*

### III. DISCUSSION

### A. Motion for Judgment of Acquittal

Defendant first argues that the evidence at trial was insufficient to prove he knew and intended that the email be understood as a threat. ECF No. [147]. Specifically, Defendant argues there was no evidence that he "intended to instill fear, no reference to a plan, date, or time, and no evidence of follow-up conduct." *Id.* at 7. He also points out that the subject line of the email for which he was indicted "was 'Notice2File' and evidence at trial established that [Defendant] did indeed go on to file a civil lawsuit." *Id.* Although "the Government called Manny Fernandez[,]" who received the email "to prove how the email was received as a true threat[,]" Defendant argues that Fernandez "called everything [Defendant] said towards a Government official a 'threat,' . . . and even then he was the only recipient to think so." *Id.* at 3. However, as Defendant acknowledges, Fernandez's reaction to receiving the email was to "forward[] the email to close family friend, [Coral Gables Police Department ("CGPD")] Chief, Ed Hudak." *Id.* That Fernandez's reaction to the email was to forward it to CGPD Chief Hudak demonstrates that he viewed it as a threat. The Government also points out that Fernandez subsequently emailed Defendant stating:

> [y]ou . . . have alluded to your right to kill those who come after you. You are also someone who I have heard espouses crazy theories about the castle doctrine should apply when the police come to your house because you have had yet another issue with your neighbors. So, that is what I mean when I say that you were a danger to yourself and the community. . . . You are responsible for your own actions, but I am deeply concerned that we are headed for a tragedy that will result in a loss of life. I would hate for anyone to be injured or killed because of

your bizarre fantasies about those who are out to get you.

 ECF No. [143-7] at 5.

The Government contends there are multiple bases upon which a reasonable jury could have relied to conclude that Defendant intended to communicate a threat or knew that his email would be viewed as a threat:

> (1) the Defendant's obvious anger towards his victims; (2) his motive for his anger; (3) his inability to recover civilly; (4) the Defendant's status as a well-educated professional; (5) the fact that he identified the victims by name; (6) the fact that the threats were made years later after he could not obtain any other recourse; (7) the fact that the threats were made to third parties (so the anticipated victims would not be tipped off); (8) the identified method of intended force (shooting) and (9) common sense to determine that the Defendant knew or intended that his statement would be perceived as threatening.

ECF No. [149] at 6-7.

The evidence supported that Defendant stated, "I will shoot onsite:" and then named four police officers with whom he had previously had negative interactions. It would strain reason to suggest that those words were intended to communicate anything other than a direct threat on their lives. Defendant argues that he "did not send the email chain to the officers, did not intend for the email chain to reach the officers, and could not predict it would be forwarded to law enforcement under the guise of being a true threat." ECF No. [147] at 10-11. However, Section 875(c) criminalizes the transmission in interstate commerce "any communication containing . . . any threat to injure the person of another[.]" 18 U.S.C. § 875(c). "The language of § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce." *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001); *see also United States v. Stoner*, 781 F. App'x 81, 86 & n.6 (3d Cir. 2019) (subjective element of Section 875(c) was satisfied where defendant "directly referenced violence targeting police officers" although police officers were not the recipient of

the threat); *United States v. Doggart*, 906 F.3d 506, 511 (6th Cir. 2018) ("Section 875(c) does not require the defendant to communicate the threat to the victim."); *United States v. Schueller,* 136 F. Supp. 3d 1074, 1078 (D. Minn. 2015) ("Section 875(c) does not require a threat 'be made directly to the intended target; it simply prohibits any threat to injure the person of another made in interstate commerce.'") (quoting *Morales*, 272 F.3d at 288).

Defendant attempts to differentiate *Morales*, "a case in which an 18 year old student repeatedly told a stranger in an internet chat room that he wanted to kill teachers and students at Milby High School in Houston, Texas[,]" by arguing that, here, Defendant "was writing to a close circle of people that did not include the referenced officers and expressing fear and frustration[.]" ECF No. [152] at 6. However, this case is similar to *Morales* because both defendants did not send their respective threats to the individuals they said they would target. 272 F.3d at 288. That Defendant sent the email to individuals in the community, including Fernandez, makes the threat more likely to reach the intended targets, undermining Defendant's argument that he was merely venting to a "close circle of people." ECF No. [152] at 6. Over a year before Defendant sent the threatening email, Fernandez responded to an email from Defendant by stating "I do not wish to be a party to any further communications from you . . . 'We ain't brothers and we ain't friends.' Leave me alone. You have sent me dozens of emails and texts over the past few days. Please stop." ECF No. [143-7] at 11. Defendant responded to Fernandez, stating he was emailing Fernandez "because I thought we were friends. I will longer forward [emails] to you. No problem." *Id.* Fernandez clearly expressed that he did not view Defendant as a friend and—more than a year before sending the threatening email—Defendant explicitly acknowledged this fact. Indeed, as Defendant points out, just 26 minutes before sending the threatening email, Defendant stated "[m]ost of you are not welcome to me [sic]

homestead." ECF No. [147] at 5 (quoting ECF No. [140-2] at 2). Defendant knew that the individuals he was emailing were not confidants and stated, "[f]or those not welcome, bring body bags." ECF No. [140-2] at 2.

Defendant points out that "30 minutes later, long before anyone with the Coral Gables Police Department knew of the email, [Defendant] explicitly said that this was meant to apply 'in self-defense[.]'" ECF No. [147] at 5. However, that argument does not change the Court's analysis. Defendant argues that his subsequent statement, in a separate email, demonstrated the "sincerely held subjective belie[f] that [Defendant] held about the extent to which his right to self-defense would apply," making "the communication inconsistent with the subjective intent necessary to sustain a conviction." *Id.* at 6. However, as the Government argues, "[a]dding the buzz words 'self-defense' is not a 'get-out-of-jail-free' card for any threatening statement." ECF No. [149] at 7 (citing *United States v. Vaksman*, 472 F. App'x 447, 448 (9th Cir. 2012) (affirming conviction where defendant stated "[i]f I were to murder him, I'd have a legitimate claim that I was merely acting in self-defense")). Defendant argues that his statement was "a correct statement of the law as demonstrated by the result at the Stand Your Ground Hearing[.]"[1]

---

[1] The Stand Your Ground hearing took place following an incident on March 24, 2020. ECF No. [143-5]. The following facts are described in the assistant state attorney's closing memo: At roughly 10:00 pm, a call was placed to CGPD reporting a noise complaint. *Id.* at 1. The 911 operator informed the caller that the noise ordinance did not go into effect until 11:00 pm but agreed to dispatch an officer. *Id.* Officer Pino Perez was dispatched and found Defendant sitting in the passenger seat of a car. Pino Perez approached Defendant and told him that his music was too loud. *Id.* Defendant then "became hostile, and yell[ed] at [Pino Perez] to 'get the fuck off my property.'" *Id.* Pino Perez requested backup in case of escalation, during which time, Defendant exited the vehicle, entered his house, and returned with a GoPro Camera. *Id.* Officer Plescow then arrived on the scene and asked Defendant to lower the music. *Id.* Defendant again yelled at the officers to "get the fuck off my property." *Id.* Defendant began walking back to his house, yelled at the officers "if you don't get off my property, I am going to shoot you," and then "quickly rushe[d] into the house." *Id.* Pino Perez and Plescow then drew their weapons and assumed tactical positioning at the side entrance to Defendant's home, continuing to announce their presence. *Id.* Defendant reappeared at the door and punched Plescow. *Id.* "Seeing no

ECF No. [147] at 6. Florida's Stand Your Ground law states:

> [a] person who uses or threatens to use force . . . is justified in such conduct and is immune from criminal prosecution and civil action . . . *unless the person against whom force was used or threatened is a law enforcement officer* . . . who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law or the person using or threatening to use force knew or reasonably should have known that the person was a law enforcement officer.

> Fla. Stat. § 776.032(1) (emphasis added).

Although "the Miami-Dade State Attorney's Office memorialized that the state court in [Defendant's] 2020 Stand Your Ground hearing was poised to find that two Coral Gables officers were not acting pursuant to a legal duty and [Defendant] would therefore be entitled to Stand Your Ground Immunity *vis a vis* the officers," this fact is insufficient to demonstrate that Defendant believed that *anytime* an officer approached his home, he would be legally justified in shooting them. ECF No. [152] at 3 (citing ECF No. [143-5]). This argument also cannot justify the threat against Officer Garcia, "who was not present on the property in March 2020 at all[.]" ECF No. [149] at 8.

Moreover, Defendant did not state in the subject email that he would only shoot the named officers "in self-defense." He reaffirmed that he would shoot the officers in a separate email 30 minutes later, stating "[g]oing forward: If encountered, in self defense, I will shoot" the officers. ECF No. [140-2] at 1-2. Although Defendant argues that this subsequent self-defense

---

weapon in the Defendant's hands, the Officers holstered their weapons and attempted to restrain the Defendant." *Id.* Defendant then lost his balance, fell backwards, and struck his head, sustaining a laceration, which resulted in bleeding on the scene. *Id.* at 1-2. During the struggle, Pino Perez was struck. *Id.* at 2. Officers restrained Defendant and placed him under arrest. *Id.*

During the prosecution of the case against Defendant, Defendant filed a motion for statutory immunity under Florida's Stand Your Ground law. *Id.* at 2. During the Stand Your Ground hearing, the court "expressed that the facts were unlikely to support the idea that Officers Pino Perez and Plescow had a legal duty to enter the property." *Id.* at 3. The State then "made an announcement of *Nolle Prosse* and dismissed the case." *Id.*

statement provides context to his intent, Defendant also stated in the same email chain, "Ruby Ridge or Blue Ridge?"[2] and "[a] cop that abuses their power should be shot dead, if necessary." *Id.*

A reasonable jury could interpret those statements as undermining any contention that Defendant intended only to engage in lawful self-defense. Therefore, the Government has presented sufficient evidence to support the jury's conclusion that Defendant intended to communicate a threat or knew that the email would be viewed as a threat. *Williams*, 390 F.3d at 1323-24.

Defendant also argues that "there is no basis for concluding that the email chain[] was— even objectively—a true threat" because the threat was conditional, it was "sent in a private context, to personal contacts, and included numerous statements of frustration, fear, and references to self-defense." ECF No. [147] at 7. The email did not intend to instill fear, Defendant argues, because it was not sent to the officers, there was "no reference to a plan, date, or time, and no evidence or follow-up conduct." *Id.* Defendant argues the email was sent within the context of his civil lawsuit and "a rant that included language about self-preservation and systemic abuse all from the narrow view of prospective future events as it applied to where he was at the time—North Georgia." *Id.* at 7-8.

The First Amendment does not protect "true threats," which "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" even if the speaker does

---

[2] As mentioned at trial, "Ruby Ridge" likely referred to an incident in August 1992 in which FBI agents and United States Marshals "engaged in an 11-day standoff with self-proclaimed white separatist Randy Weaver, his family, and a friend[,]" which resulted in the death of Weaver's wife, his son, and a U.S. Marshal. *Ruby Ridge*, Brittanica.com, https://www.britannica.com/event/Ruby-Ridge (last updated Aug. 26, 2025).

"not actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359-60 (2003). As stated above, Defendant expressed his animosity toward both the threatened officers and the individuals on the email chain. *See* ECF No. [140-2] at 2. ("Most of you are not welcome to me [sic] homestead. For those not welcome, bring body bags."). These repeated and violent emails provided sufficient evidence upon which the jury could have relied to find that the email in the Superseding Indictment was a "serious expression of an intent to commit an act of unlawful violence" to a group of individuals. *Black*, 538 U.S. at 359.

Regarding Defendant's argument that the email was conditional, he did not intend to carry out the threat, and did not make the threat directly, the Government points out that "[m]ost threats are conditional; they are designed to accomplish something; the threatener hopes that they will accomplish it, so that he won't have to carry out the threats. They are threats nonetheless." ECF No. [149] at 9 (quoting *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990)). True threats also "do not have to be intended to be carried out[,]" and, as discussed above, "can be indirect." *Id.* at 9-10 (citing *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983) and *Morales*, 272 F.3d at 288). Defendant concedes that the Government "may be legally correct" that "true threats can be conditional, do not have to be intended to be carried out and do not have to be made directly." ECF No. [152] at 5. Nevertheless, Defendant argues that "under the appropriate circumstances, none of it applies here or moves the needle any closer to supporting the verdict." *Id.* Defendant again relies on his self-defense argument that "[t]he condition here is purely a lawful one . . . Conflating an extortionate threat of offensive, unlawful violence with a proclamation of the right to self-defense misstates the conditional threat doctrine." *Id.* at 6. Defendant fails to cite any caselaw to support his argument that merely adding the phrase "in self defense"—in a separate email, 30 minutes later—to an otherwise obvious threat of violence is

sufficient to insulate him from prosecution under Section 875(c). *See* ECF No. [140-2] at 1-2.

Defendant also argues that the email was not a threat, but "political hyperbole" similar to the words that were found not to be a true threat in *Watts v. United States,* 394 U.S. 705 (1969). However, in *Watts*, the petitioner made the alleged threat within the context of "a public rally on the Washington Monument grounds[,]" after the crowd had "broke[n] up into small discussion groups and petitioner joined a gathering scheduled to discuss police brutality." 394 U.S. at 706. The 18-year-old petitioner "entered into the discussion after one member of the group suggested that the young people should get more education before expressing their views," to which the petitioner responded:

> [t]hey always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J . . . .They are not going to make me kill my black brothers.

> *Id.*

Unlike here, the discussion in *Watts* was clearly within the context of a "debate on public issues" which the Supreme Court stated, "should be uninhibited, robust, and wide open[.]" *Id.* at 708. Defendant has not pointed to any evidence at trial that he was engaged in a political debate. Instead, the string of emails demonstrates that when Defendant stated he would shoot the four officers onsite, he was "threatening people who he felt had wronged him[.]" ECF No. [149] at 11; *see* ECF No. [140-2] at 2 ("I have sustained a lot of harm. Frankly, the harm I have sustained changes most people, as it has me.").

Lastly, Defendant argues that the First Amendment requires the Court vacate his conviction because "[m]oral culpability, as the jury appears to have found here, is simply insufficient—as a matter of constitutional law—to sustain a conviction." ECF No. [147] at 12-

13. It is unclear what new arguments the Defendant is making with regard to the First Amendment because, as the Government points out, "[t]he jury was instructed that the Defendant could only be convicted if he issued a 'true threat[,]'" ECF No. [149] at 12 (citing ECF No. [130] at 6-7), and the Supreme Court "has long held that the First Amendment allows the government to criminalize 'true threats.'" *Id.* (quoting *Black*, 538 U.S. at 359). Defendant replies that "the constitutional issue here is not just a jury question. If that were the case, we would not have *Watts, Elonis, Black* and numerous other Supreme Court precedents, where the Court . . . corrected a jury verdict to align with First Amendment protections[.]" ECF No. [152] at 8. Therefore, Defendant argues, "whether a statement qualifies as a 'true threat' is not solely a jury question, it is a constitutional prerequisite to prosecution, one the Court is duty-bound to assess at the threshold." *Id.* However, of the Supreme Court cases Defendant cited as having "corrected a jury verdict to align with First Amendment protections," only *Elonis* dealt with the statute at issue here: 18 U.S.C. § 875(c). And, *Elonis* explicitly held "[t]here is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." 575 U.S. 723, 740 (2015). Because the Supreme Court has read the constitutional requirements into the text of Section 875(c)—and that is the standard upon which the jury was instructed— it is unclear what other standard Defendant believes the Court should have applied. Defendant suggests that the jury convicted merely on "[m]oral culpability[.]" ECF No. [152] at 8-9. That is not the case here. Examining the evidence in the light most favorable to the Government, the evidence "was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *Williams*, 390 F.3d at 1323.

### B. Motion for New Trial

### i. Incorrect Statements of Law

In support of his Motion for New Trial, Defendant first argues that the jury instructions invited confusion and did not clearly track the elements of the offense. ECF No. [148] at 2-3. He argues the offense instruction was legally incorrect and permitted arguments and evidence on intent and knowledge that constructively amendment the Superseding Indictment. *Id.* at 3. He states that "the grammar and structure of the indictment require the government to prove that [Defendant] intended to issue a true threat, not merely that a statement was viewed as one." *Id.* at 2 (citing *Rehaif v. United States*, 588 U.S. 225, 230 (2019)). However, Defendant argues, "[t]he instructions given, and the Government's repeated reliance on the testimony of witnesses' perception, blurred the critical distinction between knowledge that a statement would be perceived as threatening and actual intent to communicate a true threat." *Id.*

The Superseding Indictment charged Defendant "with the intent to communicate a threat and with the knowledge that it would be viewed as a threat." *Id.* at 3 (quoting ECF No. [84] at 1). Defendant argues that the jury instructions did not track the elements of the offense, however, because "'[k]nowingly' was defined in the jury instructions as 'voluntarily and intentionally and not because of a mistake or by accident.'" *Id.* (quoting ECF No. [130] at 7). Since jurors were instructed that Defendant was charged with "knowingly send[ing] in interstate commerce a true threat to injure any person[,]" ECF No. [130] at 6, and "a plain English reading of that sentence would interpret 'knowingly' (that is, intentionally) as modifying every following word . . . the government needed to prove both that [Defendant] knowingly/intentionally communicated, but also that he knew/intended the communication to be a true threat." ECF No. [148] at 3 (citing *Rehaif*, 588 U.S. at 230). Therefore, Defendant argues, the jury instructions "effectively altered the essential elements of the charged offense, amounting to a constructive amendment in

14

violation of the Fifth Amendment." *Id.* at 3-4.

To the extent Defendant argues that the jury instructions were incorrect insofar as they stated that one of the elements of Section 875(c) was that Defendant must have "sent the message with the intent to communicate a true threat, or with the knowledge that it would be viewed as a true threat," the jury instructions provided correct statement of law. ECF No. [130] at 7. In *Elonis*, the Supreme Court stated "[t]here is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat." 575 U.S. at 740. However, whereas *Elonis* stated that a the mental state required of Section 875(c) is satisfied if a defendant intends to communicate a true threat *or* sends the message with knowledge that it would be viewed as a true threat, the Superseding Indictment stated that Defendant sent the communication "with the intent to communicate a threat *and* with the knowledge that it would be viewed as a threat[.]" ECF No. [84] at 1 (emphasis added). Therefore, Defendant argues, he was "deprived . . . of the benefit of the indictment's conjunctive phrasing and the opportunity to defend against both elements." ECF No. [148] at 3. In support of this argument, Defendant cites *United States v. Cancelliere*, in which the indictment charged the defendant with "knowingly and willfully" committing money laundering, but "[a]fter the close of the evidence, the government moved to strike the word 'willfully' from Counts 6 and 7." 69 F.3d 1116, 1119 (11th Cir. 1995). The Eleventh Circuit determined that the district court's redaction of "willfully" was an "impermissible broadening of the indictment" because "the charge was read to the jury at the beginning of the trial, the jury listened to Cancelliere attempt to prove he had not acted willfully, and then the court instructed them that they could convict without mentioning any requirement that they find he acted willfully." *Id.* at 1121.

The Government responds by pointing out binding Eleventh Circuit precedent that "where a statute lists multiple means of committing the offense and the government's indictment against the defendant charges two or more of them conjunctively, the government may prove one or more of them at trial in the disjunctive." ECF No. [149] at 15 (quoting *United States v. Kincherlow*, 88 F.4th 897, 905-906 (11th Cir. 2023)). Indeed, the Eleventh Circuit clarified the limited scope of *Cancelliere*, stating "only the 'unique circumstances of defendant Cancelliere's trial made the inclusion of willfully in the indictment' a problem." *United States v. Phillips*, 4 F.4th 1171, 1177 (11th Cir. 2021) (quoting *United States v. Amede*, 977 F.3d 1086, 1101 (11th Cir. 2020)). In *Cancelliere*, the jury was instructed before trial that the government needed to prove that the defendant acted willfully, so, with that in mind, "Cancelliere focused his trial defense on proving that he did not act willfully." *Id.* Only after Cancelliere rested his case did "the court grant[] a motion by the government to redact the word 'willfully' from the jury instructions." *Id.* Here, by contrast, Defendant was provided with the Government's proposed jury instructions, which included the disjunctive instruction that was ultimately adopted by the Court, before trial began. ECF No. [100] at 20. Indeed, Defendant's own proposed jury instructions did not include the conjunctive language included in the Superseding Indictment. Instead, Defendant proposed instructing the jury that the Government must prove beyond a reasonable doubt that Defendant "either intended the statement to be taken as a true threat or consciously disregarded a substantial and unjustifiable risk that it would be viewed as a true threat." ECF No. [126] at 2. Defendant states he was "deprived of the opportunity to defend against both elements." ECF No. [148] at 3. However, "[i]t is not an unconstitutional amendment to 'drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it." *Cancelliere*, 69 F.3d at 1121 (quoting *United States v. Miller*, 471 U.S. 130,

144 (1985)).

Defendant replies that the Government "ignores the constitutional overlay imposed by *Elonis* . . . which requires proof of a culpable mental state negligence." ECF No. [152] at 10. It is unclear how a correct statement of law—that a defendant may be found guilty if they sent the message with the intent to communicate a true threat, or with the knowledge that it would be viewed as a true threat—would lower the required proof of mental state to negligence, as Defendant suggests. *Id.*

Defendant also argues that the jury instruction, "[a] conditional threat can be a true threat. In other words, a threat to commit violence unless a particular act is taken can be a true threat[,]" was "necessarily at odds with [the] next instruction: 'The law recognizes that self defense is not unlawful violence.'" ECF No. [148] at 4 (quoting ECF No. [130] at 7). "Because self-defense . . . was the only possible condition born[e] out by the evidence, the instructions eliminated the requirement that 'the speaker means to communicate a serious expression of an intent to commit an act of *unlawful violence*[.]'" *Id.* (quoting *Black*, 538 U.S. at 359). To the extent Defendant argues this "materially alters the offense charged[,]" ECF No. [148] at 4, it is unclear how it does so if both the conditional threat instruction and self-defense instruction were correct statements of law and *Defendant* requested the self-defense instruction. *See United States v. Dillard*, 795 F.3d 1191, 1200 (10th Cir. 2015) ("[O]ur cases make clear that a statement may constitute a true threat even if it is conditional."); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) ("Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats."); *see also* ECF No. [126] at 2 (proposing instruction that "[t]he law recognizes that self-defense is not unlawful violence.").

As the Government notes, to the extent Defendant objects to the "juxtaposition of the offense instructions—related to unlawful violence—with his requested instruction that self-defense was not unlawful violence" the Court proposed "a fulsome version of Florida self-defense law" in the jury instructions "and the Defendant refused." ECF No. [149] at 15 n.6.

Defendant's proposed instruction on self-defense stated:

> The law recognizes that self-defense is not unlawful violence. Therefore, if a person makes a statement reflecting an intent to lawfully defend themselves, that statement does not amount to a "true threat."

> Under Florida law, a person is justified in using or threatening to use deadly force if he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or to prevent the imminent commission of a forcible felony. Moreover, under Florida's "Stand Your Ground" law, a person who is not engaged in unlawful activity and is in a place he has a right to be has no duty to retreat and has the right to stand his ground and meet force with force.

ECF No. [126] at 2.

However, as the Government raised during the charge conference, Fla. Stat. § 776.032(1) includes an exception to the Stand Your Ground law where "the person against whom force was used or threatened is a law enforcement officer . . . who was acting in the performance of his or her official duties . . . ." Fla. Stat. § 776.032(1). Therefore, merely stating that "[u]nder Florida law, a person is justified in using or threatening to use deadly force if he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or to prevent the imminent commission of a forcible felony," as Defendant proposed, would not have been an entirely accurate statement of the law.

### ii.   Constructive Amendment and Variance

Defendant argues that the Government "improper[ly] expan[ded]" its "theory of prosecution" by "repeatedly impl[ying] that the officers it called to the stand were the 'victims' of threats and did so in the context of other lines within the email chain[] that were not charged

as an offense." ECF No. [148] at 5 (citing *United States v. Keller*, 916 F.2d 628, 632 (11th Cir.
1990)). Defendant also contends that the Government "repeatedly implied, either through
argument or the testimony of witnesses like . . . Fernandez, that other expressive conduct or prior
communications by [Defendant] represented 'other threats." *Id.* The result was "a constructive
amendment in violation of the Fifth Amendment." *Id.* (citing *United States v. Elbeblawy*, 899
F.3d 925, 937-38 (11th Cir. 2018).

A constructive amendment occurs "when the 'essential elements of the offense contained
in the indictment are altered—for instance, by a faulty jury instruction—to broaden the possible
bases for conviction beyond what [was] contained in the indictment.'" *United States v. Gyetvay*,
149 F.4th 1213, 1235 (11th Cir. 2025) (quoting *United States v. Feldman*, 931 F.3d 1245, 1260
(11th Cir. 2019)). Alternatively, "[t]he second type of error is a material variance, which occurs
'when the charging terms of the indictment are left unaltered, but the evidence offered at trial
proves facts materially different from those alleged in the indictment.'" *Id.* (quoting *United
States v. Johnson*, 713 F.2d 633, 643 n.9 (11th Cir. 1983)).

In *Keller*, which Defendant cites, the Eleventh Circuit opined that "where the indictment
specifically alleges that only two individuals conspired, and contains no language indicating that
there were unnamed or unknown conspirators, we believe that an essential element of the offense
is the identity of the individuals who agreed." 916 F.2d at 634. Therefore, "the trial court
incorrectly stated that the jury 'need not find that all those named in the indictment were part of
the conspiracy.'" *Id.* at 636. The Eleventh Circuit noted that "the initial instruction standing
alone may not have been enough to constitute an amendment, [but] the trial court exacerbated the
problem with its supplemental instructions in response to the jury's question." *Id.* In response to
a jury question, the trial court, describing a hypothetical conspiracy between the judge and the

court reporter, instructed the jury "[i]f you find that I didn't enter into an illegal agreement with Mr. Huseby to rob a bank, the evidence must show beyond a reasonable doubt that I entered an agreement with *some other person* . . . [i]f, however, the government convinces you that I planned to rob the bank with someone else, then it is possible to convict me and acquit him[.]" *Id.* (internal citations omitted). Contrary to the trial court's representation of the issue, because the indictment alleged that Keller "conspired solely with Smith[,]" the jury "needed to conclude that Smith was the getaway driver before they could convict Keller." *Id.* "The government introduced a great deal of evidence that Keller conspired to rob the bank with the getaway driver." *Id.* However, under the trial court's instructions to the jury, "the jury could have determined that Keller conspired with the getaway driver but have been uncertain about the identity of that person." *Id.*

The Government argues that "at no point did the United States attempt to broaden the indictment beyond the essential elements proved." ECF No. [149] at 16. Indeed, the theory of liability remained the same throughout the course of the trial.

It is unclear exactly what evidence Defendant argues constructively amended the indictment given that "evidence that was properly admitted as intrinsic to the charged offenses does not impermissibly broaden the indictment to include other crimes." *United States v. Prophete*, 522 F. App'x 583, 587 (11th Cir. 2013) (citing *United States v. Lehder-Rivas,* 955 F.2d 1510, 1519 n. 5 (11th Cir. 1992)). And unlike *Keller*, in which the jury received conflicting instructions over the elements of the charged offense, to prevent any possible confusion over the introduction of other emails, Defendant "requested—and received—a limiting instruction that he was on trial *only* for the charged email." ECF No. [149] at 17. The instruction stated:

> The Government has alleged in the indictment that the only phrase in this case that violated the law is: "I will shoot onsite: [E.P., A.P.P., A.S., and D.G.]." While

you may consider all relevant evidence, and must consider context, in evaluating whether the Government has proven its case beyond and to the exclusion of every reasonable doubt, the only phrase on which you can find a violation of the law is the one specified in the indictment. That is, if you find that the Government has not met its burden as to the specific phrase that it alleges in the indictment, you may not find that some other phrase, even within the same email, was a violation of the law. Your verdict must be based on the allegation in the indictment and only the allegation in the indictment.

ECF No. [130] at 8-9.

As the limiting instruction advised that "if you find that the Government has not met its burden as to the specific phrase that it alleges in the indictment, you may not find that some other phrase, even within the same email, was a violation of the law[,]" the indictment was not constructively amended.

### iii.    404(b) Evidence

Defendant also contends that the Government introduced evidence "which the Court had gone to great lengths to exclude pretrial." ECF No. [148] at 5. However, Defendant does not point to any specific evidence that the Court excluded in its Order on Motion to Exclude 404(b) Evidence ("404(b) Order"), ECF No. [76], that was improperly introduced at trial. The Court granted Defendant's Motion to Exclude Evidence of Other Acts Under Rule 404(b) in full and, in accordance with the 404(b) Order, none of those incidents[3] was introduced at trial. To the extent Defendant argues that the Government improperly introduced communications among Defendant, Fernandez, and CGPD, as well as prior interactions with CGPD "not to prove motive or context but simply to cast him as a dangerous, unhinged person[,]" ECF No. [148] at 5, the Government points out that "Defendant agreed to introduce the fact that he was previously

---

[3] In the 404(b) Order, the Court excluded: "(1) December 31, 2022 threats to kill Defendant's wife and in-laws; (2) testimony from Defendant's neighbor, D.I., that Defendant would yell at, chase, and threaten his neighbors; (3) Defendant's January 1, 2024 commitment under the Florida Marchman Act; (4) the recovery of a handgun, spent casings, and ammunition at Defendant's residence on January 1, 2024; and (5) an October 16, 2021 threat to Defendant's neighbor, M.T." ECF No. [76] at 2, 13.

arrested in 2015 by [GCPD] and, indeed, introduced communications in which other people described him as dangerous and unhinged." ECF No. [149] at 17 (citing ECF No. [143-7] at 5).

In his Reply, Defendant fails to respond to the Government's argument that "[w]ithout a question or exhibit to consider the United States cannot respond" to Defendant's assertion that the Government "injected prior communications as unnoticed Rule 404(b) evidence." *Id.* Instead, Defendant reaffirms that "[t]he prosecution repeatedly elicited testimony and argued about uncharged incidents, other emails, and [Defendant's] prior disputes with law enforcement[,] thereby "expand[ing] the factual basis for conviction beyond the charged communication, inviting the jury to decide the case based on propensity and character evidence rather than the elements of § 875(c)." ECF No. [152] at 11. Given Defendant's failure to cite any specific piece of evidence that was improperly introduced, "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue," and precludes the Court from considering the matter further. *Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009).

### iv.    Limiting Cross-Examination

Defendant argues that "the extent to which officers had acted violently and criminally and so outside their duties as law enforcement officers[] was a critical component of the defense[,]" and the Court improperly limited "the defense's attempt to demonstrate the reasonableness of [Defendant's] belief and the extent to which officers had acted outside the law" on cross-examination. ECF No. [148] at 7. Specifically, Defendant contends that the Court "did not permit questioning of Officer Steele on the extent to which he believed that the law did not apply to him by questioning him on those beliefs and conduct that demonstrated those beliefs." *Id.* (citing *United States v. Doherty*, 233 F.3d 1275 (11th Cir. 2000)). The Government responds that the June 2025 video of Officer Steele that Defendant intended to introduce was excluded for "the same reason this Court excluded Rule 404(b) evidence involving this

Defendant[;]" the video "was dated *years* after the March 2020 incident here" and "was not probative of whether the Defendant knew or intended to communicate a threat three years earlier in December 2022." ECF No. [149] at 18. The Government also argues that "[t]o the extent that the Defendant wanted to impeach Officer Steele, it is not clear how Officer Steele's credibility was in issue in this case." *Id.* In his Reply, Defendant fails to address that the video of Officer Steele was taken years after the charged conduct, but contends, without further explanation, that the "defense sought to question Steele about prior conduct that directly supported [Defendant's] state of mind and the reasonableness of his belief in the need for self-defense." ECF No. [152] at 11.

"It is well established that '[t]he right of confrontation guaranteed by the Sixth Amendment includes the right of cross-examination.'" *United States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017) (quoting *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992)). However, this right is not unlimited. *Id.* "The trial court has broad discretion under [Federal Rule of Evidence] 611(b) to determine the permissible scope of cross-examination and will not be reversed except for clear abuse of that discretion." *Id.* "The denial of a defendant's Confrontation Clause right to cross-examination is examined for harmless error." *Id.* (quoting *United States v. Ndiaye*, 434 F.3d 1270, 1286 (11th Cir. 2006)).

Given that Defendant has failed to explain how the introduction of a video taken in June 2025 would have "directly supported [Defendant's] state of mind" when he sent an email in December 2022, the video was properly excluded at trial. *See* ECF No. [152] at 11. To the extent Defendant argues that he should have been permitted to question Officer Steele on whether "he believed that the law did not apply to him[,]" it is unclear how this line of questioning would be relevant. ECF No. [148] at 7. Defendant argues that "[a]s a general matter, the cross-examination

of a government witness about the basis for the witness'[s] opinion on a central issue and any bias that affects the witness'[s] opinion must be permitted." *Id.* (citing *United States v. Willner*, 795 F.3d 1297 (11th Cir. 2000)). However, as the Government properly points out, "Officer Steele's beliefs about whether he was above the law would not provide a defense to the charged conduct." ECF No. [149] at 19. Not only did Officer Steele testify "that he did not think he was above the law[,]" but Defendant also "does not explain how he would have impeached Officer Steele on this point." *Id.*

Defendant cites *Doherty*, in which the Eleventh Circuit reversed a district court that admitted an inculpatory statement by a co-defendant, thereby prejudicing Doherty "by testimony he was not allowed to cross-examine." 233 F.3d at 1282. However, unlike here, *Doherty* presented a classic *Bruton* problem: "the admission of a confession or statement by a non-testifying defendant which inculpate[d Doherty] violate[d Doherty's] Sixth Amendment right to confront a witness." *Id.* at 1281 (citing *Bruton v. United States,* 391 U.S. 123 (1968)). Officer Steele was not a co-defendant, and Defendant has not cited any statement by Officer Steele that inculpated Defendant.

Defendant also cites *Willner* for the proposition that "the cross-examination of a government witness about the basis for the witness'[s] opinion on a central issue and any bias that affects the witness'[s] opinion must be permitted." ECF No. [148] at 7. Indeed, *Willner* stated that "exploring the basis for a witness's knowledge and any potential bias that could affect his testimony cannot be 'outside the scope.' This is particularly true for a government witness during a criminal case." 795 F.3d at 1320. However, it is not clear that Defendant sought to explore the basis for Officer Steele's knowledge or bias that could affect his testimony. As the Government points out, "Officer Steele testified that he transported the Defendant to the hospital,

the Defendant received stitches and otherwise refused care." ECF No. [149] at 18-19. He also

stated that "he was not threated by the email and did nothing different because of it." *Id.* at 19.

To the extent Defendant argues that he sought to impeach Officer Steele's recollection of the

events that took place on March 24, 2020 by demonstrating that Officer Steele believed "the law

did not apply to him," Defendant has not demonstrated that any limits on his cross-examination

of Officer Steele affected his substantial rights. *See Willner*, 795 F.3d at 1321-22 (although a

"constitutional error's effect must clear a higher bar" than a non-constitutional error to avoid

reversal, limiting the defense's cross-examination was not a basis for reversal because there was

"overwhelming evidence" of the defendant's guilt, as charged in the indictment). Here, as the

Government correctly points out, Defendant had the opportunity to "collaterally impeach[]"

Officer Steele through Special Agent Oliver regarding "whether Officer Steele remembered the

Defendant spitting on him." ECF No. [149] at 19. Even if the jury "disbelieved everything

Officer Steele said, it is not clear how that would have made a difference to whether the

Defendant knew or intended to communicate a threat." *Id.* Therefore, any error in limiting

Defendant's cross-examination of Officer Steele was harmless. *See Willner*, 795 F.3d at 1321-22

(applying harmless error analysis to error in limiting defense's cross-examination).

Defendant also raises, for the first time, in his Reply, that he was "similarly limited in

[his] cross-examinations of Officers Pino-Perez and Plescow." *Id.* Defendant provides no

explanation as to how he was limited in cross-examining Officers Pino Perez or Plescow.

Accordingly, the Court declines to consider the argument. *See Herring v. Sec'y, Dep't of Corr.*,

397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, 'arguments raised

for the first time in a reply brief are not properly before a reviewing court.'" (quoting *United*

*States v. Coy,* 19 F.3d 629, 632 n. 7 (11th Cir. 1994))).

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant's Motion for Judgment of Acquittal, **ECF No. [147],** is **DENIED**.

2.  Defendant's Motion for New Trial, **ECF No. [148],** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida on October 20, 2025.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record